STATE OF CONNECTICUT *v.* VERNOL KELVIN GARY
(AC 30740)

Flynn, C. J., and Harper and Dupont, Js.*

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued October 21, 2009—officially released April 27, 2010

*Robert E. Byron*, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *David Shepack*, state's attorney, and *Dawn M. Gallo*, assistant state's attorney, for the appellant (state).

*Opinion*

HARPER, J. The defendant, Vernol Kelvin Gary, appeals from the judgment of conviction, rendered after a jury trial, of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) (1), and kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A). The defendant claims that (1) the prosecutor did not disclose potentially exculpatory evidence to him in a timely manner, thereby depriving the defendant of his constitutional right to a fair trial, and (2) the court improperly

instructed the jury with respect to the kidnapping charge. We affirm the judgment with respect to the defendant's conviction of sexual assault and attempted sexual assault. We reverse the judgment with respect to the defendant's conviction of kidnapping. Accordingly, the case is remanded for a new trial on the kidnapping charge.

The jury reasonably could have found the following facts. The victim[1] is a female who was born in 1983. The defendant is a male who was born in 1962. The victim met the defendant for the first time in November, 2006, at the residence of the victim's drug supplier. On November 30, 2006, several weeks after their initial encounter, the defendant called the victim at approximately 2 a.m. The defendant asked the victim if she wanted to "hang out." The victim agreed to see the defendant and gave him directions to her apartment. Upon the defendant's arrival, he and the victim began drinking vodka together. They spent the early morning hours in the victim's bedroom but did not have any sexual contact with one another. At approximately 8 a.m., the defendant and the victim walked to a liquor store, where they purchased more vodka. Upon returning to the apartment, the victim and the defendant had several alcoholic mixed drinks and were joined by the victim's roommate, who had been asleep when the defendant initially arrived. The roommate left for work after a few drinks.

After the victim's roommate left, the defendant indicated that he was tired and asked if he could lie down. The victim told the defendant that he could, but that she needed to remove some pillows from her bed. After

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

the victim removed the pillows from her bed, the defendant asked the victim to close the window because he was cold.

It is at this point that the defendant's attack on the victim began. The victim moved to close the window and, when she turned back, the defendant grabbed her by the throat. The defendant proceeded to throw the victim on the ground. As he held the victim down, the defendant removed his pants and then the victim's pants. The victim struggled with the defendant and pulled his earring out of his ear, causing him to bleed. The victim also bit the defendant on his chest. As the victim continued to fight, the defendant forced her legs apart and forcibly engaged in vaginal intercourse with her. After penetrating the victim's vagina with his penis several times, the defendant discontinued vaginal intercourse and attempted to engage in anal intercourse with the victim. Unsuccessful, the defendant forced the victim to perform oral sex on him. Eventually, the victim managed to get out from under the defendant and reach the door, which was locked. The defendant grabbed the victim and prevented her from opening the door. The victim was screaming and continued to struggle with the defendant. She then heard a knock at the front door of the apartment. The victim managed to escape from the defendant, and ran from her bedroom and out the front door of her apartment in a state of total undress. When she exited the apartment, she discovered that the knocking had been from two police officers who were standing outside her apartment.

The two police officers were John Marchi and Kim Maher of the Winchester police department. They had been dispatched to the victim's apartment because of a complaint by the tenant who lived below the victim. When the officers arrived outside the victim's apartment, they banged on the door several times and identified themselves as police officers. There was no answer,

but the officers heard cries for help emanating from within the victim's apartment. The officers were about to enter the apartment using a master key they had obtained from the building's manager when the door flung open and the victim ran out screaming, "get him away from me, get him out of here." The victim ran past the officers, curled into a fetal position and began crying. Officer Marchi looked into the apartment and saw the defendant standing with no clothes on. Marchi observed that the defendant had fresh injuries, including trauma to his chest and blood on his ear and toe. Marchi immediately detained the defendant while Maher attended to the victim. An ambulance was called for the victim, and the defendant, after putting on clothes, was taken by Marchi to the police station, where photographs were taken of his injuries. Additional facts will be set forth as necessary.

I

The defendant first claims that the state committed prosecutorial impropriety by failing to disclose exculpatory evidence. Specifically, the defendant alleges that the state improperly redacted portions of a medical report that revealed the victim's prior diagnosis of bipolar disorder as well as medications she was taking to treat bipolar disorder. He claims that the redacted portions were potentially exculpatory and that, because he was not able to view the unredacted version until the first day of evidence, he was denied a fair trial.[2] We conclude that the defendant waived his suppression of

---

[2] In his statement of the issues, the defendant appears to claim that, after becoming aware of the allegedly late disclosure, the court improperly allowed the victim to testify. The defendant provides no further factual or legal analysis in support of this claim. Therefore, we find that this claim is briefed inadequately and decline to afford it review. See *State* v. *Brown*, 256 Conn. 291, 312, 772 A.2d 1107 (declining to review claims of prosecutorial impropriety where no analysis or authority presented to support claims), cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001).

exculpatory evidence claim and therefore decline to afford it review.

The following additional facts and procedural history underlie the defendant's claim. On March 7, 2008, the court granted the defendant's request to subpoena the victim's medical records. On March 12, 2008, the court heard testimony from witnesses for the first time. Before any witnesses were called to testify, the defendant's counsel informed the court that the victim's medical records had arrived and were in the custody of the clerk of the court and under seal. Defense counsel stated that he previously had received a copy of the medical records from the state, but that certain information had been blacked out by the prosecutor.[3] Defense counsel requested that the court review the records and determine whether the blacked out portions were admissible because he believed they "could affect the credibility of [the victim], specifically, anything to do with drug or alcohol intake or medications that she might have been on that's been redacted." The court agreed to review the records to determine their admissibility. During a recess, the court reviewed the victim's medical records and determined that certain portions that had been redacted by the state were admissible, including the victim's report to emergency room personnel of a prior diagnosis of bipolar disorder and the medications she was taking to treat it.

During cross-examination of the victim, defense counsel questioned the victim about her prior diagnosis of bipolar disorder and the medications she was taking to treat it. The following colloquy took place:

[3] On December 6, 2007, the state filed a motion for joinder to consolidate this case with two other criminal cases pending against the defendant in the Litchfield judicial district. Attached to this motion was a copy of the redacted version of the victim's medical records. The defendant did not subpoena these records until March 4, 2008.

"Q. What medications were you on?

"A. I was on, um, lithium, Lamictal, Wellbutrin and Topamax for a misdiagnosis of bipolar.

"Q. For a misdiagnosis?

"A. Correct.

"Q. You are not bipolar?

"A. I am not."

Later that day, the court heard the testimony of Julia Barnas, the nurse who initially treated the victim when she arrived at a hospital following the attack. During direct examination, the prosecutor established that the victim had reported to Barnas that she was bipolar. The prosecutor asked Barnas whether the victim presented clinical symptoms of a manic episode at the time she was evaluated:

"Q. Did the patient appear to be in a manic phase at the time you treated her?

"A. No.

"Q. Did she appear to be controlled in her situation?

"A. Yes.

"Q. If a patient with that condition were in a manic phase, or uncontrolled, in an uncontrolled phase of that disease, would there then be cause for concern as to their recollection of events?

"A. Yes.

"Q. Was that the case here?

"A. No."

The next day, defense counsel began his cross-examination of Barnas. After confirming that the victim had

informed Barnas that she was taking the drugs Wellbutrin, lithium and Lamictal, the following colloquy took place:

"Q. What is [Lamictal] for?

"A. Lamictal is for—it's used in bipolar.

"Q. And for what effect?

"A. It is often used with a combination of the Lamictal and the other pills to help stabilize a patient.

"Q. It's a mood stabilizer, correct?

"A. Yes.

"Q. For someone who is bipolar. And what is the purpose for Wellbutrin?

"A. That has many. It could be for depression. It could be used also in conjunction with the other medications for bipolar.

"Q. And how about lithium?

"A. Same.

"Q. Antidepressant?

"A. No, more of, um—it's not used for depression, it's more for, um, to stabilize a patient.

"Q. More of a mood stabilizer?

"A. Yes.

"Q. But all three in your experience are prescribed for bipolar patients?

"A. Yes."

At the conclusion of testimony that day, defense counsel told the court that he had concerns regarding the victim's self-reported diagnosis of bipolar disorder and the medications she was taking, and requested that he be allowed to do more research into the matter over

the weekend, and possibly call an expert to testify or publish a learned treatise to the jury. When court resumed several days later, on March 18, 2008, defense counsel requested that he be allowed to introduce three exhibits pertaining to the medications the victim was taking for the treatment of bipolar disorder. The exhibits were extracts from the online version of the Physicians' Desk Reference. In response to the prosecutor's objection that the extracts were hearsay and not relevant, defense counsel made the following argument: "[The extracts are] not offered . . . as evidence of any kind of treatment of the [victim] in this particular case. They're offered because they explain some of the effects and contraindications of the three medications, Wellbutrin, lithium and Lamictal, that the [victim] in this case—complaining witness in this case told the nurse in the emergency room." The court subsequently admitted the three excerpts into evidence.

Thus, by the time the jury began its deliberations, the jurors had before them the unredacted medical report that was filled out by Barnas along with her testimony, both of which demonstrated that the victim self-reported a prior diagnosis of bipolar disorder and was taking medications consistent with the treatment of bipolar disorder. There was also the testimony of the victim herself, who, although she claimed that she was misdiagnosed with bipolar disorder, admitted to taking Wellbutrin, lithium and Lamictal. Finally, the jury also had the excerpts from the Physicians' Desk Reference that described these medications. The Physicians' Desk Reference description of lithium that was admitted into evidence notes that it is used to "treat the manic episodes of manic-depressive illness, a condition in which a person's mood swings from depression to excessive excitement. A manic episode may involve some or all of the following symptoms: [a]ggressiveness; [e]lation; [f]ast, urgent talking; [f]renetic physical

activity; [g]randiose, unrealistic ideas; [h]ostility; [l]ittle need for sleep; [p]oor judgment." The description for Wellbutrin noted that it is prescribed to "help relieve major depression" and warns that it should not be taken with alcohol or cocaine because such use might increase the likelihood of a seizure. The description for Lamictal stated that it "is used to help prevent the manic and/or depressive phases of bipolar disorder."

The defendant claims the prosecutor committed prosecutorial impropriety by withholding exculpatory evidence in violation of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Specifically, he argues that because the prosecutor did not disclose redacted portions of the victim's medical records pertaining to bipolar disorder until ordered to do so by the court, he was denied his constitutional right to a fair trial. We conclude, however, that due to the defendant's deliberate decision to address the disclosure of the victim's diagnosis of bipolar disorder and treatment through the introduction of Physicians' Desk Reference extracts and his failure to claim at trial that he was unfairly prejudiced by the allegedly late disclosure, the defendant waived any potential *Brady* claim.

We begin our discussion by setting forth the fundamental legal elements of the defendant's claim that the prosecution's allegedly late disclosure of potentially exculpatory evidence deprived him of a fair trial. "In order to establish a violation under *Brady* and its progeny, [the] defendant has the burden of demonstrating not only that the state suppressed information that was favorable and material to him but also that it was not disclosed upon request. . . . The circumstance that claimed *Brady* material was disclosed during, and not after, trial hardly precludes the application of *Brady* which declared the right to material and favorable evidence as part of the fundamental right to a fair trial. . . . *Brady*'s due process basis, therefore, requires a

determination of when disclosure must be made to ensure a fair trial. . . . The unmistakable tone of *Brady* is that evidence required to be disclosed must be disclosed at a time when it can be used. . . . No denial of due process occurs if *Brady* material is disclosed . . . in time for its effective use at trial. . . . It must, nevertheless, be pointed out that [a] delayed disclosure [of exculpatory material] by the prosecution is not per se reversible error. . . .

"Whether the tardy disclosure of *Brady* material fairly requires a continuance or a delay in order to make effective use of such matter is essentially a factual question in each case. . . . The focus is not on the fact of nondisclosure, but the impact of the nondisclosure on the jury's verdict. . . . The effect then of disclosable evidence should be viewed in terms of its likely effect upon those on whom the outcome rests—the jury. . . . Submission to the factfinder carries out the promise of *Brady* and its progeny by its fair trial guarantee that an accused has constitutional access through the prosecution to evidence that is favorable and material to guilt or punishment." (Citations omitted; internal quotation marks omitted.) *State* v. *Pollitt*, 199 Conn. 399, 413–15, 508 A.2d 1 (1986).

Given this legal framework, it is apparent that the defendant *might* have had a colorable *Brady* claim had he wanted to raise an objection related to the allegedly late disclosure or request a mistrial.[4] When there is a

---

[4] It should be noted that we make no determination of whether there was an actual *Brady* violation in the case at hand. Because the prosecutor furnished the redacted versions of the victim's medical records to the defendant as early as December 6, 2007, the state claims that there was no suppression of evidence or late disclosure. Essentially, the state argues that the defendant cannot sustain a *Brady* claim because he and his trial counsel were at least aware of the possible existence of potentially exculpatory evidence contained within the redacted portions of the medical report and failed to request access to this information in a timely manner. Indeed, our Supreme Court previously has held that there is "no reason why a defendant who is aware of [the existence of potentially exculpatory] evidence should not be required to seek it at a point in time when any potential constitutional

late disclosure of potentially exculpatory evidence, a defendant is entitled to a factual determination of whether the suppressed information was revealed at a point in the trial when it fairly could be used. See id., 416 (case remanded for factual determination of likely effect on jury of late disclosure). The state argues that the defendant waived any potential claim arising from the allegedly late disclosure because, being well aware of the circumstances surrounding the disclosure and the nature of the information contained in the redacted portions of the medical report, he chose an alternative means by which to address this issue and did not claim during trial that the timing of the state's disclosure affected his right to a fair trial. We agree.

It is well established that "when a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal." *State* v. *Smith*, 289 Conn. 598, 621, 960 A.2d 993 (2008). Waiver may occur either expressly or impliedly by a defendant's deliberate action. Id. As the state points out in its brief, on March 13, 2008, the defendant personally aired concerns to the court regarding the timing of the prosecution's disclosure of the redacted portions of the victim's medical report. Specifically, the defendant sought to obtain new counsel because of what he perceived to be the ineffectiveness of his own lawyer in obtaining the unredacted medical report earlier. In denying the defendant's request, the court made the following statement to the

infirmity arising from the state's failure to provide the evidence can be avoided without the need for a new trial." *State* v. *Skakel*, 276 Conn. 633, 706, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006). Although *Skakel* appears to support the state's argument in this regard, due to our determination that the defendant waived any potential *Brady* claim, there is no need for us to engage in a separate analysis of whether potentially exculpatory evidence was suppressed or disclosed in an untimely manner. Such an analysis would only be necessary if we were to review the substance of the defendant's *Brady* claim.

defendant outside the presence of the jury: "[I]t was on my order that the portion of the medical record which indicated that there was a diagnosis, which we've not heard an explanation of, and certain medications prescribed, one of which I can take judicial notice is indeed consistent with a diagnosis of manic depression, and that is lithium; you now have that known to you. I will note that in the event that there is an interest on the part of the defense of publishing to the jury information, which is, has scientific value, information pertaining to what that drug is and what its side effects can be, that that is something . . . that . . . wasn't revealed until yesterday, as appears to be in the case, is a matter that doesn't, I think, in any way interfere with your ability or your counsel's ability to put information pertaining to that on the record of this case. It can be done. And in the event that it is a path that makes sense, it's something that can be considered, and this is actually fairly normal. It's nothing out of the ordinary at all."

The defendant then expressed satisfaction with the court's explanation and suggested approach for addressing the information contained in the redacted portions of the medical report. He also apologized to his attorney for questioning his effectiveness. Later that day, after reviewing the Physicians' Desk Reference sections on the various medications that the victim was taking to treat bipolar disorder, defense counsel made the following statement to the court. "I am very concerned, especially about the—again, I have not been able to digest [the Physicians' Desk Reference], but the Wellbutrin description, I think, is of interest. So, what I would propose is that I be able to prepare something or we be able to prepare something prior to [the next court session]. And I can do this in the form of a witness to present evidence of the effects of these medications

or with a smooth copy of the Physicians' Desk Reference or another learned treatise." The court agreed to the defendant's request, and court recessed until March 18, 2008. When the court reconvened, defense counsel requested that he be allowed to publish to the jury portions of the Physicians' Desk Reference describing the medications the victim reported taking to Barnas. The court allowed the Physicians' Desk Reference extracts into evidence over the state's objection.

As demonstrated previously, the record reveals that the defendant and his counsel were well aware of the potentially exculpatory nature of the information disclosed in the medical records. Following a lengthy explanation by the court of why it believed the defense had a reasonable opportunity to make use of the information, it was defense counsel who proposed that he be given time to "prepare something" in regard to the diagnosis of bipolar disorder. After being granted this request, and following a recess of several days, the defense made the deliberate decision to address the issue of the allegedly late disclosure by publishing to the jury the Physicians' Desk Reference extracts. No request for a further continuance or a mistrial was made.

The defendant had a fair opportunity to raise a *Brady* claim at trial but deliberately chose to address the alleged late disclosure by a different avenue. As such, the defendant waived his right to raise a *Brady* claim on appeal, and we conclude that no injustice was done to the defendant. "To reach a contrary conclusion would result in an ambush of the trial court by permitting the defendant to raise a claim on appeal that his or her counsel expressly had abandoned in the trial court." *State* v. *Holness*, 289 Conn. 535, 543, 958 A.2d 754 (2008).

## II

The defendant next claims that the court committed instructional error when it failed to instruct the jurors that if they found that the defendant had restrained the victim, such restraint would not constitute kidnapping if it merely was incidental to the commission of other crimes, namely, sexual assault and attempted sexual assault. We agree with the defendant and remand the case for a new trial on this issue.

The defendant seeks review of his unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). "Under *Golding*, a defendant may prevail on an unpreserved claim only if the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two prongs govern whether we may review the claim, while the second two control whether the defendant may prevail on his claim because there was constitutional error that requires a new trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Smith*, supra, 289 Conn. 619–20. We find that the record is adequate to review the alleged claim of error, and therefore the first prong is satisfied. We also find that, because an improper jury instruction on an element of an offense is of constitutional dimension, the second prong of *Golding* is satisfied. See, e.g., *State* v. *Singleton*, 292 Conn. 734, 745, 974 A.2d 679 (2009).

Having determined that the claim is reviewable, we move on to the third prong of *Golding*. "[I]ndividual

jury instructions should not be judged in artificial isola-
tion, but must be viewed in the context of the overall
charge. . . . The pertinent test is whether the charge,
read in its entirety, fairly presents the case to the jury
in such a way that injustice is not done to either party
under the established rules of law. . . . Thus, [t]he
whole charge must be considered from the standpoint
of its effect on the [jurors] in guiding them to the proper
verdict . . . and not critically dissected in a micro-
scopic search for possible error. . . . Accordingly, [i]n
reviewing a constitutional challenge to the trial court's
instruction, we must consider the jury charge as a whole
to determine whether it is reasonably possible that the
instruction misled the jury. . . . In other words, we
must consider whether the instructions [in totality] are
sufficiently correct in law, adapted to the issues and
ample for the guidance of the jury. . . . Moreover, as
to unpreserved claims of constitutional [impropriety]
in jury instructions, we have stated that under the third
prong of *Golding*, [a] defendant may prevail . . . only
if . . . it is reasonably possible that the jury was misled
. . . ." (Citations omitted; internal quotation marks
omitted.) *State* v. *Hampton*, 293 Conn. 435, 452–53, 978
A.2d 1089 (2009).

Thus, our inquiry is twofold. We must first determine
whether the instructions in totality were sufficiently
correct in law, adapted to the issues and ample for the
guidance of the jury. If we find the instructions were
deficient in this regard, then we must determine
whether it is reasonably possible that the jury was mis-
led. For the reasons we will set forth, we conclude that
(1) the instructions in totality were legally deficient,
and (2) it is reasonably possible that the jury was misled.
Therefore, the defendant is entitled to a new trial as to
the charge of kidnapping in the first degree.

Pursuant to § 53a-92 (a) (2) (A), a person is guilty of
kidnapping in the first degree when he abducts another

person and "restrains the person abducted with intent to . . . inflict physical injury upon him or violate or abuse him sexually . . . ." While the defendant's appeal was pending, our Supreme Court decided *State v. Salamon*, 287 Conn. 509, 542, 949 A.2d 1092 (2008) (en banc), in which it determined that the crime of kidnapping requires an intent "to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit [another] crime."[5]

In *Salamon*, our Supreme Court "reconsidered [its] long-standing interpretation of our kidnapping statutes, General Statutes §§ 53a-91 through 53a-94a. . . . The defendant had assaulted the victim at a train station late at night, and ultimately was charged with kidnapping in the second degree in violation of § 53a-94, unlawful restraint in the first degree, and risk of injury to a child. . . . At trial, the defendant requested a jury instruction that, if the jury found that the restraint had been incidental to the assault, then the jury must acquit the defendant of the charge of kidnapping. . . . The trial court declined to give that instruction. . . .

"[W]e [thus] reexamined our long-standing interpretation of the kidnapping statutes to encompass even restraints that merely were incidental to and necessary for the commission of another substantive offense, such as robbery or sexual assault. . . . We ultimately concluded that [o]ur legislature . . . intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against that victim. Stated otherwise, to commit

---

[5] The rule announced in *Salamon* is applicable to the present case because the present case was pending when our Supreme Court articulated a new construction of the kidnapping statutes in *Salamon*. See *State v. DeJesus*, 288 Conn. 418, 429 n.9, 953 A.2d 45 (2008).

a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime. . . .

"We explained in *Salamon* that a defendant may be convicted of both kidnapping and another substantive crime if, at any time prior to, during or after the commission of that other crime, the victim is moved or confined in a way that had independent criminal significance, that is, the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime. Whether the movement or confinement of the victim is merely incidental to and necessary for another crime will depend on the particular facts and circumstances of each case. Consequently, when the evidence reasonably supports a finding that the restraint was not merely incidental to the commission of some other, separate crime, the ultimate factual determination must be made by the jury. For purposes of making that determination, the jury should be instructed to consider the various relevant factors, including the nature and duration of the victim's movement or confinement by the defendant, whether that movement or confinement occurred during the commission of the separate offense, whether the restraint was inherent in the nature of the separate offense, whether the restraint prevented the victim from summoning assistance, whether the restraint reduced the defendant's risk of detection and whether the restraint created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense. . . . Applying this standard to the facts in *Salamon*, we concluded that, although the defendant had not been charged with assault, the judgment of conviction of kidnapping in the second degree had to be reversed and the case remanded for a new trial because the defendant was entitled to a jury instruction

explaining that a kidnapping conviction could not lie if the restraint was merely incidental to the assault." (Citations omitted; internal quotation marks omitted.) *State* v. *Hampton*, supra, 293 Conn. 459–61.

In this case, following closing arguments, the court explained to the jury that "the offense of kidnapping in the first degree has two essential elements which the state must prove beyond a reasonable doubt to obtain a conviction: one, that at the time and in the place specified in the count in question, the defendant abducted [the victim]; and, two, that in abducting [the victim] the defendant restrained her with intent to violate her sexually." The court then went on to define the term "abduct." The court explained that "[u]nder our law, as it applies to this case, abduct means to restrain a person with intent to prevent her liberation by using or threatening to use physical force or intimidation. In light of this definition, the state must prove three essential subelements beyond a reasonable doubt to establish that the defendant abducted [the victim]: one, that the defendant restrained [the victim]; two, that in so restraining her, the defendant intended to prevent her liberation; and, three, that the means by which the defendant restrained her was by using or threatening to use physical force or intimidation." The court instructed the jury that "restrain" means "to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with her liberty, by confining her in the place where the restriction commences without consent. . . . [A] person intentionally restricts another person's movements when he acts with the conscious objective of restricting her movements." A written charge that was given to the jury was substantially the same as the oral charge delivered by the court.

The kidnapping instructions in the case before us plainly were not in conformity with *Salamon*, and therefore were not sufficiently correct in law, adapted to the

issues and ample for the guidance of the jury. Moreover, the defendant was charged with and convicted of multiple sexual assaults and an attempted sexual assault that were in close temporal proximity to the defendant's restraint of the victim. The evidence reasonably supports a finding that the restraint merely was incidental to the commission of other crimes, namely, sexual assaults and attempted sexual assault. Given this factual posture, we conclude that it is reasonably possible that the jury was misled as to the essential element of intent.

Having concluded that it is reasonably possible that the jury was misled as to the requisite intent for kidnapping, we next consider the appropriate remedy for the instructional error. In *State* v. *Sanseverino*, 287 Conn. 608, 624, 949 A.2d 1156 (2008), our Supreme Court relied on its opinion in *Salamon* "to reverse the defendant's conviction of kidnapping in the first degree, reasoning that although the question of whether kidnapping may stand as a separate offense is one for the jury . . . under the facts of [that case], no reasonable jury could have found the defendant guilty of kidnapping in the first degree on the basis of the evidence that the state proffered at trial. . . . [Having] found no evidence that the defendant [had] restrained [the victim] to any greater degree than that necessary to commit the sexual assault . . . we reversed the defendant's conviction of kidnapping in the first degree and remanded the case to the trial court with direction to render a judgment of acquittal. . . .

"In *State* v. *DeJesus*, [288 Conn. 418, 434, 953 A.2d 45 (2008)], we considered the appropriate remedy for the instructional impropriety identified in *Salamon* and *Sanseverino*, and concluded that in such situations, the appropriate remedy . . . is to reverse the defendant's kidnapping conviction and to remand the case to the trial court for a new trial. Accordingly, we recognized

the impropriety in our procedural conclusion in *Sanseverino*, and insofar as the proper remedy in that case should have been a new trial, we overruled *Sanseverino*." (Citations omitted; internal quotation marks omitted.) *State* v. *Hampton,* supra, 293 Conn. 461. Thus, because the instructional impropriety was of the variety identified in *Salamon,* we reverse the defendant's kidnapping conviction and remand the case to the trial court for a new trial on that charge.

The judgment is reversed only as to the conviction of kidnapping in the first degree and the case is remanded for a new trial on that charge. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

———

* The listing of judges reflects their seniority status on this court as of the date of oral argument.