******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

WALTER HINDS *v.* COMMISSIONER OF
CORRECTION
(SC 19393)
(SC 19394)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Robinson and
DiPentima, Js.*

*Argued October 6, 2015—officially released April 26, 2016*

*Jo Anne Sulik*, supervisory assistant state's attorney, with whom, on the brief, were *Kevin D. Lawlor*, state's attorney, *Erika L. Brookman*, assistant state's attorney, and *Mary M. Galvin*, former state's attorney, for the appellant in Docket No. SC 19393 and appellee in Docket No. SC 19394 (respondent).

*Adele V. Patterson*, senior assistant public defender, for the appellee in Docket No. SC 19393 and appellant in Docket No. SC 19394 (petitioner).

*Opinion*

McDONALD, J. In 2002, the petitioner, Walter Hinds, was convicted of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1) and kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A).[1] Three years after the petitioner's judgment of conviction was final, this court overruled an interpretation of our kidnapping statutes to which it had adhered in the face of numerous challenges over more than three decades, under which the crime of kidnapping did not require that the restraint used be more than that which was incidental to and necessary for the commission of another crime against the victim. See *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008). Subsequently, this court determined that the holding in *Salamon* overruling that overly broad interpretation applied retroactively to collateral attacks on final judgments. See *Luurtsema* v. *Commissioner of Correction*, 299 Conn. 740, 751, 12 A.3d 817 (2011) (*Luurtsema II*). The principal issues in the present case are whether the petitioner's failure to challenge our long-standing interpretation of kidnapping in his criminal proceedings requires him to overcome the bar of procedural default, and what constitutes the proper standard for assessing whether the petitioner is entitled to a new trial on that charge.

Upon our grants of certification, the respondent, the Commissioner of Correction, and the petitioner separately appealed from the Appellate Court's judgment, which affirmed the judgment of the habeas court granting in part and denying in part the petitioner's petition for a writ of habeas corpus and ordering a new trial on the kidnapping charge. *Hinds* v. *Commissioner of Correction*, 151 Conn. App. 837, 839, 97 A.3d 986 (2014). In his certified appeal, the respondent contends that the Appellate Court applied the wrong cause and prejudice standards in concluding that the petitioner had overcome his procedural default of a challenge to the kidnapping instruction and therefore could prevail on the merits. In the petitioner's appeal, he contends that the Appellate Court improperly affirmed the habeas court's judgment insofar as it concluded that a due process claim based on the cumulative effect of trial errors that individually were harmless is not cognizable under Connecticut law.

With respect to the respondent's appeal, we conclude that *Luurtsema II*'s retroactivity decision compels the conclusion that challenges to kidnapping instructions in criminal proceedings rendered final before *Salamon* are not subject to the procedural default rule. We further conclude that the petitioner is entitled to a new trial on the kidnapping charge because the omission of a *Salamon* instruction was not harmless beyond a reasonable doubt. With respect to the petitioner's appeal, we conclude that, even assuming we were to

recognize cumulative trial error as a basis for a due process violation, the improprieties in the petitioner's criminal trial would not rise to such a level. Therefore, we affirm the judgment of the Appellate Court.

The jury reasonably could have found the following facts in support of the kidnapping and sexual assault convictions, none of which the petitioner disputed except his identity as the perpetrator.[2] On August 28, 2000, at approximately 9 p.m., sixteen year old K[3] left the Super Stop & Shop supermarket in Milford on foot to head to a friend's apartment that was approximately five minutes away. En route, K cut through the property of In-Line Plastics Tool Company (In-Line Plastics). As she approached the property, K noticed a pickup truck exit the driveway of In-Line Plastics, but then reenter and come to a stop in the parking area. As she walked past the truck, she turned around and observed that the driver had exited the vehicle and was walking behind her. She continued walking and, upon turning around again, she saw that the driver was right behind her and wearing only underwear and a sleeveless shirt. Although it was nighttime, the lights on the surrounding buildings sufficiently illuminated the area to enable K to see the face of the driver, the petitioner.

At that point, K started to run through the parking lot of In-Line Plastics, in the direction of some trees between the back parking lot and the route to her friend's apartment. The petitioner ran after K, grabbed her, and put one of his hands around her waist and his other hand over her mouth. He instructed her not to scream or he would kill her. The petitioner then threw K down and dragged her by the legs to a grassy area between the In-Line Plastics parking lot and a small house, behind an overgrown bush where it was darker. The petitioner sat on K's chest with his legs on the outside of her arms so she could not move and instructed K to open her mouth. He inserted his penis into her mouth and forced her to perform fellatio on him, ejaculating into her mouth. The petitioner then patted her on the cheek and told her she could leave. Too afraid to move, K remained where she was. As the petitioner walked back toward his truck, K pleaded with him not to kill her, telling him that she would not tell anybody what had happened. The petitioner turned around and looked at K, again enabling her to see his face. He then entered his truck and drove away. K's description of her attacker and his truck eventually led to the petitioner's identification and arrest.

The record reflects the following procedural history. At trial, the jury was instructed, without objection, on the elements of abduction and restraint in accordance with established law regarding kidnapping. Following his conviction of sexual assault in the first degree and kidnapping in the first degree, the defendant claimed on direct appeal that the trial court had committed four

improprieties. See *State* v. *Hinds*, 86 Conn. App. 557, 558–59, 861 A.2d 1219 (2004), cert. denied, 273 Conn. 915, 871 A.2d 372 (2005). None related to the jury instruction on kidnapping. The Appellate Court separately examined each of the claimed improprieties, and concluded that three improprieties had occurred but each was harmless. Id., 563–77. Accordingly, it affirmed the judgment of conviction. Id., 577. This court denied the petitioner's petition for certification to appeal. See *State* v. *Hinds*, 273 Conn. 915, 871 A.2d 372 (2005).

Thereafter, this court issued its decisions in *Salamon* and *Luurtsema II*, respectively overruling its overly broad interpretation of our kidnapping statutes and deeming the interpretation pursuant to *Salamon* to apply retroactively. Following the appointment of habeas counsel, the petitioner filed a second amended petition for a writ of habeas corpus. Therein, he alleged that: (1) there was constitutional error in the kidnapping instruction, pursuant to *Salamon* and *Luurtsema II*; and (2) there were cumulative trial errors that violated his right to a fair trial. The respondent asserted procedural default as affirmative defenses to both counts, as well as failure to state a cognizable claim with respect to the second count. The habeas court granted the petition as to the first count, concluding that the petitioner had proved that he was entitled to the *Salamon* limiting instruction and that it was not clear beyond a reasonable doubt that the verdict on the kidnapping charge would have been the same had the jury been given the instruction. The habeas court rejected the respondent's procedural default defense, reasoning that *Luurtsema II* compelled such a result and that good cause existed for trial counsel's failure to seek a *Salamon* instruction in any event because firmly established law would have made a request for such an instruction futile. The habeas court denied the petition as to the second count, concluding that a due process claim of cumulative harm had not been recognized in Connecticut.

Both parties appealed from the judgment, and the Appellate Court consolidated the appeals. See *Hinds* v. *Commissioner of Correction*, supra, 151 Conn. App. 839 n.1. Although the Appellate Court affirmed the habeas court's judgment; id., 839; it adopted different reasoning with respect to the kidnapping instruction. It determined that the proper framework for addressing that claim in light of the procedural default defense is the cause and prejudice standard set forth in *Wainwright* v. *Sykes*, 433 U.S. 72, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977), as adopted by this court in *Johnson* v. *Commissioner of Correction*, 218 Conn. 403, 409, 589 A.2d 1214 (1991). See *Hinds* v. *Commissioner of Correction*, supra, 151 Conn. App. 852–53. The Appellate Court concluded that the cause standard had been met because there was no reasonable basis for the petitioner to have asked for an instruction that had been rejected by controlling decisional law. Id., 855. The Appellate

Court further concluded that, although the habeas court's decision suggested that it improperly had placed the burden on the respondent to prove that the omission of the *Salamon* instruction was harmless; id., 855–56; the petitioner had demonstrated the requisite actual and substantial prejudice. Id., 858–59. The court cited the close alignment in time and place of the victim's restraint and abduction to the sexual assault and the fact that the proper instruction would have required the jury to consider whether the restraint and abduction were merely incidental to the sexual assault. Id., 859. In sum, it concluded that "[t]he failure to give a *Salamon* instruction, under the facts presented at trial, substantially deprived the petitioner of his constitutional right to have the jury properly informed of the meaning of the language of the kidnapping charge." Id. The parties' certified appeals to this court followed.

In our review of the issues raised, we are mindful that, while "[t]he underlying historical facts found by the habeas court may not be disturbed unless the findings were clearly erroneous . . . [q]uestions of law and mixed questions of law and fact receive plenary review." (Internal quotation marks omitted.) *Crawford* v. *Commissioner of Correction*, 294 Conn. 165, 174, 982 A.2d 620 (2009). Because the certified appeals do not involve challenges to facts found, we apply plenary review.

I

We begin with the respondent's appeal challenging the Appellate Court's affirmance of the habeas court's judgment insofar as it granted the petitioner a new trial on the kidnapping charge. The respondent does not challenge the Appellate Court's conclusion that the habeas court properly determined that a *Salamon* limiting instruction would apply under the facts of the present case. Rather, he contends that the Appellate Court did not correctly apply the legal standard for assessing cause and prejudice to overcome procedural default. With respect to cause, he contends that *Salamon* itself disproves the Appellate Court's determination that the law on kidnapping was settled at the time of the petitioner's criminal trial. He further contends that, even if the law was settled, futility does not establish cause. At oral argument, the respondent suggested that, if this court were inclined to accept the petitioner's futility argument, it would be preferable to create a limited exception for *Salamon* claims rather than to change the law on procedural default. With respect to prejudice, the respondent contends that the prejudice necessary to overcome procedural default can only be established if the petitioner demonstrates that he would not have been convicted had the jury been charged in accordance with *Salamon*, a burden that the petitioner cannot meet.

In response, the petitioner first contends that the

habeas court properly concluded that there had not been a procedural default. The petitioner asserts that the respondent failed to plead and prove that affirmative defense. The petitioner further asserts that the habeas court properly concluded that *Luurtsema II* compels the conclusion that there had been no default because that decision examined the policies underlying procedural default and found them to be outweighed by the importance of providing a habeas corpus remedy for persons convicted prior to *Salamon* under the incorrect interpretation of kidnapping.[4] Alternatively, the petitioner contends that the Appellate Court properly concluded that he had established cause and prejudice to excuse any procedural default. We agree with the petitioner that *Luurtsema II* effectively resolved the procedural default question such that the doctrine does not apply to his *Salamon* claim. We further conclude that the petitioner has established his entitlement to a new trial on his kidnapping charge.

A

To address the questions before us, it is necessary to provide some background regarding the extraordinary circumstances preceding and following our decision in *Salamon*. Under our Penal Code, the hallmark of a kidnapping is an abduction, a term that is defined by incorporating and building upon the definition of restraint.[5] *State* v. *Salamon*, supra, 287 Conn. 530; see also footnote 1 of this opinion (defining kidnapping in first degree). In 1977, this court squarely rejected a claim that, when the abduction and restraint of a victim are merely incidental to some other offense, such as sexual assault, that conduct cannot form the basis of a guilty verdict on a charge of kidnapping. See *State* v. *Chetcuti*, 173 Conn. 165, 170–71, 377 A.2d 263 (1977). The court pointed to the fact that our legislature had declined to merge the offense of kidnapping with sexual assault or with any other felony, as well as its clearly manifested intent in the kidnapping statutes not to impose any time requirement for the restraint or any distance requirement for the asportation. Id. On numerous occasions between that decision and the present petitioner's criminal trial, this court reiterated that position. See, e.g., *State* v. *Wilcox*, 254 Conn. 441, 465–66, 758 A.2d 824 (2000); *State* v. *Amarillo*, 198 Conn. 285, 304–306, 503 A.2d 146 (1986); *State* v. *Vass*, 191 Conn. 604, 614, 469 A.2d 767 (1983); *State* v. *Johnson*, 185 Conn. 163, 177–78, 440 A.2d 858 (1981), aff'd, 460 U.S. 73, 103 S. Ct. 969, 74 L. Ed. 2d 823 (1983); *State* v. *Briggs*, 179 Conn. 328, 338–39, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980); *State* v. *DeWitt*, 177 Conn. 637, 640–41, 419 A.2d 861 (1979); *State* v. *Lee*, 177 Conn. 335, 342–43, 417 A.2d 354 (1979). The court appeared to leave open the possibility that there could be a factual situation in which the asportation or restraint was so miniscule that a conviction of kidnapping would constitute an absurd

and unconscionable result that would render the statute unconstitutionally vague as applied. See *State* v. *Troupe*, 237 Conn. 284, 315, 677 A.2d 917 (1996); *State* v. *Tweedy*, 219 Conn. 489, 503, 594 A.2d 906 (1991). A kidnapping conviction predicated on the movement of the sexual assault victim from one room in her apartment to another, however, was deemed not to constitute such a result. *State* v. *Tweedy*, supra, 503.

In *State* v. *Luurtsema*, 262 Conn. 179, 203–204, 811 A.2d 223 (2002) (*Luurtsema I*), decided a few months after the present petitioner's criminal trial concluded, this court foreclosed the possibility of an absurd or unconscionable result as a matter of statutory interpretation. In that case, the defendant, Peter Luurtsema, had moved the victim from the couch to the floor, forced the victim's legs apart, and manually choked her while attempting to perpetrate a sexual assault. Id., 200. The defendant was convicted of attempt to commit sexual assault in the first degree, kidnapping in the first degree, and assault in the second degree. This court again rejected the request to interpret our kidnapping statute so as to require that the restraint and abduction to support kidnapping exceed that which is incidental to the commission of another crime. In accordance with the consistent refrain of the decisions that preceded it, the court in *Luurtsema I* concluded that, in light of the express statutory terms, "[t]he defendant's interpretation of the kidnapping statute is simply not the law in this state." (Internal quotation marks omitted.) Id., 202.

Six years later, in *Salamon*, the court was persuaded to reexamine the broad, literal interpretation to which it had adhered for more than three decades. See *State* v. *Salamon*, supra, 287 Conn. 513–14. In concluding that it must overrule its long-standing interpretation, the court went beyond the language of the kidnapping statutes to consider sources that it previously had overlooked. It explained: "Upon examination of the common law of kidnapping, the history and circumstances surrounding the promulgation of our current kidnapping statutes and the policy objectives animating those statutes, we now conclude the following: Our legislature, in replacing a single, broadly worded kidnapping provision with a gradated scheme that distinguishes kidnappings from unlawful restraints *by the presence of an intent to prevent a victim's liberation*, intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are *merely incidental to and necessary for* the commission of another crime against that victim. Stated otherwise, to commit a kidnapping in conjunction with another crime, a defendant must *intend* to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime." (Emphasis added.) Id., 542.

Following that decision, Luurtesma filed a habeas petition seeking to have the holding in *Salamon* applied retroactively to his case. *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 743. In *Luurtsema II*, this court concluded as a matter of state common law that policy considerations weighed in favor of retroactive application of *Salamon* to collateral attacks on judgments rendered final before that decision was issued. In response to a host of arguments advanced by the state against retroactivity, the court concluded: "We are not unsympathetic to the legitimate concerns . . . relating to the general importance of preserving the finality of criminal convictions. . . . [H]owever, we are convinced that . . . in cases such as this, the interests of finality must give way to the demands of liberty and a proper respect for the intent of the legislative branch." Id., 766.

B

With this background in mind, we turn to the question of whether the petitioner's *Salamon* claim is subject to the doctrine of procedural default because of his failure to challenge his kidnapping instruction in his criminal proceedings. We conclude that it is not.[6]

Although our court has often recognized that we are not bound by federal postconviction jurisprudence; see *Small* v. *Commissioner of Correction*, 286 Conn. 707, 720, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008); *Valeriano* v. *Bronson*, 209 Conn. 75, 83 n.7, 546 A.2d 1380 (1988); *Vena* v. *Warden*, 154 Conn. 363, 366, 225 A.2d 802 (1966); we have adopted the procedural default standard prescribed in *Wainwright* v. *Sykes*, supra, 433 U.S. 87. See *Jackson* v. *Commissioner of Correction*, 227 Conn. 124, 132, 629 A.2d 413 (1993); *Johnson* v. *Commissioner of Correction*, supra, 218 Conn. 409. "Under this standard, the petitioner must demonstrate good cause for his failure to raise a claim at trial or on direct appeal and actual prejudice resulting from the impropriety claimed in the habeas petition. . . . [T]he cause and prejudice test is designed to prevent full review of issues in habeas corpus proceedings that counsel did not raise at trial or on appeal for reasons of tactics, inadvertence or ignorance . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 567–68, 941 A.2d 248 (2008). The cause and prejudice requirement is not jurisdictional in nature, but rather a prudential limitation on the right to raise constitutional claims in collateral proceedings. *Taylor* v. *Commissioner of Correction*, 284 Conn. 433, 447 n.18, 936 A.2d 611 (2007).

The prudential considerations underlying the procedural default doctrine are principally intended to vindicate two concerns: federalism/comity and finality of

judgments. See *Coleman* v. *Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Murray* v. *Carrier*, 477 U.S. 478, 495, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986); *Crawford* v. *Commissioner of Correction*, supra, 294 Conn. 180–81; *Jackson* v. *Commissioner of Correction*, supra, 227 Conn. 134; see also *Brecht* v. *Abrahamson*, 507 U.S. 619, 635, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) ("The reason most frequently advanced in our cases for distinguishing between direct and collateral review is the [s]tate's interest in the finality of convictions that have survived direct review within the state court system. . . . We have also spoken of comity and federalism. The [s]tates possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the [s]tates' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." [Citations omitted; internal quotation marks omitted.]). Of course, in state habeas proceedings, only finality and the constellation of issues related thereto are implicated. See *James L.* v. *Commissioner of Correction*, 245 Conn. 132, 142 n.11, 712 A.2d 947 (1998) (noting that statutory constraints on federal court jurisdiction over federally filed writs of habeas corpus "reflect congressional views of federalism and comity that are not pertinent to the exercise of state court jurisdiction over state habeas corpus cases").

In *Luurtsema II*, this court engaged in a comprehensive analysis of finality considerations when deciding to apply *Salamon* retroactively to collateral attacks on final judgments.[7] *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 765–73. The court addressed in turn five rationales advanced by the state in support of either adopting a per se rule against retroactive relief or denying relief in Luurtsema's case: "(1) the fact that law enforcement relied on the old interpretation of the kidnapping statutes while trying the petitioner; (2) the fact that the retroactive application of *Salamon* has no deterrent value or remedial purpose; (3) the fear that our courts will be 'flooded' with habeas petitions from other inmates convicted under § 53a-92 (a) (2) (A); (4) the difficulty of retrying such cases where significant time has elapsed since conviction; and, perhaps most importantly (5) the concern that victims will be retraumatized by again having to testify and endure another round of judicial proceedings." Id., 765. This court did not find any of these rationales a sufficient basis, individually or collectively, for withholding retroactive application of *Salamon* to collateral attacks on final judgments. Id., 766–73. Accordingly, application of the procedural default bar to protect finality of judgments seems inconsistent with the reasoning in *Luurtsema II* that "the interests of finality must give way to the demands of liberty and a proper respect for the intent

of the legislative branch.”[8] Id., 766; see also id., 759 ("under our system of justice, considerations of finality simply cannot justify the continued incarceration of someone who did not commit the crime of which he stands convicted").

Other aspects of the court's reasoning bolster our conclusion that this holding was not intended to afford relief to only those petitioners who could avoid or overcome the procedural default bar. The court in *Luurtsema II* extensively considered limitations on its retroactivity ruling, but did not cite procedural default as such a limitation.[9] Availability of that doctrine and its heightened prejudice standard would have been a natural response to the state's floodgates argument had the court intended the doctrine to apply. Instead, the court responded: "There is little doubt that some petitioners will come forward contending that they are serving substantially longer sentences than are prescribed by the criminal code, as properly construed. In its brief, however, the state has identified only five such petitions[10] that have been filed in the more than two years since we decided *Salamon* and [*State* v. *Sanseverino*, 291 Conn. 574, 969 A.2d 710 (2009)].[11] At oral argument before this court, the state declined to provide additional information as to the number of present inmates who might have a colorable claim under *Salamon*. Of the 1.5 percent of [D]epartment of [C]orrection inmates incarcerated for kidnapping or unlawful restraint, one can reasonably assume that only a small subset will fall within the ambit of *Salamon*. Of those, we expect that courts will be able to dispose summarily of many cases where it is sufficiently clear from the evidence presented at trial that the petitioner was guilty of kidnapping, as properly defined, [such] that any error arising from a failure to instruct the jury in accordance with the rule in *Salamon* was harmless. See, e.g., *State* v. *Hampton*, 293 Conn. 435, 463–64, 978 A.2d 1089 (2009). Likewise, we doubt the state will expend the resources to retry cases where it is reasonably clear that a petitioner could not have been convicted of kidnapping under the correct interpretation of the statute." (Footnotes altered.) *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 769–70.

One particular aspect of this response is telling. The court cited the harmless error standard for direct appeal—a standard wholly inconsistent with the actual prejudice standard for procedurally defaulted claims— as the limiting mechanism for colorable but ultimately nonmeritorious claims. Id., 770. Compare *State* v. *Hampton*, supra, 293 Conn. 463 (on direct appeal, "the test for determining whether a constitutional [impropriety] is harmless . . . is whether it appears beyond a reasonable doubt that the [impropriety] complained of did not contribute to the verdict obtained" [internal quotation marks omitted]), with *United States* v. *Frady*, 456 U.S. 152, 170, 172, 102 S. Ct. 1584, 71 L. Ed. 2d 816

(1982) (in procedurally defaulted claim, petitioner must prove that impropriety "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions," such that, with proper instruction, there was "substantial likelihood" that jury would not have convicted petitioner [emphasis omitted]).

In the present case, the respondent's procedural default argument rests on the same finality concerns that were deemed insufficiently weighty in *Luurtsema II*. Those concerns carry little weight in the present case because we can have a fair assurance that the state would effectively be in the same position even if the petitioner had raised a *Salamon* type challenge in his criminal proceedings. Not only was there a three decades long history preceding the petitioner's criminal trial of rejecting such a challenge, but mere months after the petitioner's trial, the court in *Luurtsema I* again rejected such a challenge. See *State* v. *Luurtsema*, supra, 262 Conn. 202. Thus, we are not persuaded that the state would suffer any greater burden with respect to retrial if the petitioner prevails in this habeas action than it would have suffered had the petitioner challenged his kidnapping instruction in his criminal proceedings.

In sum, we conclude that the court in *Luurtsema II* determined that retroactive relief is available for all collateral attacks on judgments rendered final prior to *Salamon*, irrespective of whether the kidnapping instruction was challenged in the criminal proceedings, as long as the evidence warrants such relief. Accordingly, the petitioner's *Salamon* claim is not subject to procedural default.

C

In light of this conclusion, we turn to the question of whether the petitioner is entitled to a new trial due to the omission of a proper instruction on kidnapping in accordance with *Salamon*. This determination requires us to consider the legal parameters set forth in *Salamon*, and the standard for assessing whether the omission of such guidance to the jury requires reversal of the petitioner's kidnapping conviction.

In *Luurtsema II*, the court indicated that the proper standard to make such an assessment would be the harmless error standard applied on direct appeal. See *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 770, citing *State* v. *Hampton*, supra, 293 Conn. 463–64. That is the standard that was applied by the habeas court in the present case and has been applied in several other cases. See, e.g., *Eric M.* v. *Commissioner of Correction*, 153 Conn. App. 837, 845, 108 A.3d 1128 (2014), cert. denied, 315 Conn. 915, 106 A.3d 308 (2015); *St. John* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-11-4003987-S, 2013

WL 1277284 (March 7, 2013); see also *Epps* v. *Commissioner of Correction*, 153 Conn. App. 729, 738, 740, 104 A.3d 760 (2014) (determining that petitioner must overcome procedural default but applying direct appeal harmless error standard in prejudice analysis); *Nogueira* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-14-4006033-S, 2015 WL 4172992 (June 10, 2015) (same); *Smith* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-08-4002747-S, 2011 WL 4582841 (September 13, 2011) (same).

On direct appeal, "[i]t is well established that a defect in a jury charge which raises a constitutional question is reversible error if it is reasonably possible that, considering the charge as a whole, the jury was misled. . . . [T]he test for determining whether a constitutional error is harmless . . . is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. . . . A jury instruction that improperly omits an essential element from the charge constitutes harmless error [only] if a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Fields*, 302 Conn. 236, 245–46, 24 A.3d 1243 (2011). The failure to charge in accordance with *Salamon* is viewed as an omission of an essential element; id.; and thus gives rise to constitutional error. See *State* v. *LaFleur*, 307 Conn. 115, 125, 51 A.3d 1048 (2012).

We note that, except for the fact that this standard imposes the burden of persuasion exclusively on the state, it is effectively the same standard that this court applies in habeas proceedings when such an error is advanced through a claim of ineffective assistance of counsel. See *Small* v. *Commissioner of Correction*, supra, 286 Conn. 728 (The court cited the direct appeal harmless error standard and then explained: "Because the petitioner raises his claim that he suffered harm as a result of the trial court's failure to instruct the jury on attempt via his claims of ineffective assistance of counsel, our review is limited to the issue of whether, under *Strickland*,[12] the petitioner can demonstrate that trial counsel's failure to object to the erroneous charge or appellate counsel's failure to challenge it on appeal prejudiced him. We therefore . . . assess whether there is a reasonable probability that, if the issue were brought before us on direct appeal, the petitioner would have prevailed." [Footnote added.]).

Under this harmless error standard, it is clear that the petitioner is entitled to a new trial. "[T]o commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that

which is necessary to commit the other crime." *State* v. *Salamon*, supra, 287 Conn. 542. "[A] defendant may be convicted of both kidnapping and another substantive crime if, at any time prior to, during or after the commission of that other crime, the victim is moved or confined in a way that has independent criminal significance, that is, the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime. Whether the movement or confinement of the victim is merely incidental to and necessary for another crime will depend on the particular facts and circumstances of each case. . . . For purposes of making that determination, the jury should be instructed to consider the various relevant factors, including the nature and duration of the victim's movement or confinement by the defendant, whether that movement or confinement occurred during the commission of the separate offense, whether the restraint was inherent in the nature of the separate offense, whether the restraint prevented the victim from summoning assistance, whether the restraint reduced the defendant's risk of detection and whether the restraint created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense." (Footnote omitted.) Id., 547–48.

In light of these parameters, we cannot conclude "beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error . . . ." (Internal quotation marks omitted.) *State* v. *Fields*, supra, 302 Conn. 246. As *Salamon* makes clear, when the evidence regarding the perpetrator's intent is susceptible to more than one interpretation, that question is one for the jury. The petitioner's actions in the present case were a continuous, uninterrupted course of conduct lasting minutes. The petitioner could not accomplish the sexual assault without grabbing K and bringing her to the ground.[13] He released K as soon as the sexual assault was completed. Thus, the essential fact is the movement of K. K's asportation from the spot where she was grabbed to the site of the sexual assault, however, appears to have been a matter of yards and accomplished in a matter of seconds.[14] Although that movement took K from the lit parking lot to the adjacent dark ground by a bush, an act that undoubtedly reduced the risk of detection in one regard, it also brought K in very close proximity to an occupied residence in the lot adjacent to the parking lot. There is no evidence that the risk of harm to K was made appreciably greater by the asportation in and of itself.[15] A properly instructed jury reasonably could conclude that the petitioner's intention in moving K from the lit lot to the dark, grassy area was to prevent her from being able to get a good look at his face, because he could not perform in the lit space, or simply to avoid the hard paved surface while kneeling on

the ground.

Under the deficient instruction, however, the jury effectively was compelled to conclude that the petitioner committed kidnapping in the first degree once it credited K's account. See footnotes 1 and 5 of this opinion. With the proper instruction, the jury would have to consider whether the state had proved beyond a reasonable doubt that the petitioner's intention in committing these actions had sufficient independent significance from his intention to commit the sexual assault as to warrant a conviction of kidnapping in the first degree. The aforementioned facts provided a logical basis for it to conclude that they did not. Therefore, the state could not prove that the omission of the *Salamon* instruction was harmless beyond a reasonable doubt. Accordingly, the petitioner is entitled to relief under our established harmless error standard.

We note that this court has not had the occasion to consider whether, even in the absence of procedural default, a more stringent standard of harm should apply in collateral proceedings. In *Brecht* v. *Abrahamson*, supra, 507 U.S. 623, a bare majority of the United States Supreme Court departed from its history of more than 200 years of parity between direct appeals and habeas corpus proceedings for constitutional claims. See R. Hertz & J. Liebman, 2 Federal Habeas Corpus Practice and Procedure (6th Ed. 2011) § 31.1, pp. 1679–80. Citing federalism, comity, finality and other prudential considerations, the court determined that habeas proceedings require a standard that imposes a less stringent burden on the state when the constitutional error is not structural. *Brecht* v. *Abrahamson*, supra, 634 ("an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment" [internal quotation marks omitted]); see also id., 643 (Stevens, J., concurring). The court in *Brecht* determined that the same standard for determining whether habeas relief must be granted for nonconstitutional error applies, namely, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." (Internal quotation marks omitted.) Id., 637. "The determinative consideration . . . is not the strength of the evidence or the probability of conviction at a hypothetical retrial absent the error. Rather, the relevant question is whether the error substantially affected the actual thinking of the jurors or the deliberative processes by which they reached their verdict." (Footnote omitted.) R. Hertz & J. Liebman, supra, § 31.4 [d], p. 1720. Because the state bears the burden of proof, "where the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error," the petitioner must win. *O'Neal* v. *McAninch*, 513 U.S. 432, 437, 115 S. Ct. 992, 130 L. Ed. 2d 947 (1995); see id., 438 ("The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even

so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." [Emphasis omitted; internal quotation marks omitted.]).

*Brecht* and its progeny have raised numerous questions as to the precise standard to be applied in determining whether a particular type of error is harmless, and what degree of certainty as to whether that standard has been met.[16] See *Peck* v. *United States*, 102 F.3d 1319, 1320 (2d Cir. 1996) (Newman, C. J., concurring) (attempting "to identify and illuminate uncertainties that have been created by the way the [United States] Supreme Court has explicated its recent harmless error jurisprudence in the context of constitutional errors" as to these questions); R. Hertz & J. Liebman, supra, § 31.4 [a], p. 1708 (citing questions left open by *Brecht* and its progeny). Some courts, like the Second Circuit, have decided that the *Brecht* harmless error standard serves as the actual prejudice component for excusing procedurally defaulted claims, thus similarly analyzing defaulted and nondefaulted claims. See *Peck* v. *United States*, 106 F.3d 450, 456–57 (2d Cir. 1997) (citing cause and actual prejudice procedural default standard from *United States* v. *Frady*, supra, 456 U.S. 167–68, but applying standard in *Brecht* of " 'substantial and injurious effect or influence in determining the jury's verdict' " as actual prejudice standard). We need not decide in the present case whether to enter the fray by adopting the standard in *Brecht* and the uncertainties that accompany it. Nevertheless, because the dissenting justices' conclusion that the petitioner is not entitled to a new trial due to his failure to establish the actual prejudice to overcome a procedurally defaulted claim appears to signal a retreat from our holdings in *Salamon* and *Luurtsema II*, we take this opportunity to explain why the petitioner would prevail even under the more stringent standard applied by the dissents.

This court has suggested that we would apply the standard in *United States* v. *Frady*, supra, 456 U.S. 152, for the prejudice showing required to overcome procedural default. See *Johnson* v. *Commissioner of Correction*, supra, 285 Conn. 570–71; *Valeriano* v. *Bronson*, supra, 209 Conn. 84. Under *Frady*, the petitioner "must shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." (Emphasis omitted.) *United States* v. *Frady*, supra, 170. In applying that standard, the court indicated that the petitioner would have to demonstrate that, with the proper instruction, there was a "substantial likelihood" that the jury would not have found the petitioner guilty of the crime of which he was convicted. Id., 172; see also *United States* v. *Pettigrew*, 346 F.3d 1139, 1144 (D.C. Cir. 2003) (equating substantial likelihood standard in *Frady* to "reasonable probability that,

but for [the errors], the result of the proceeding would have been different" [internal quotation marks omitted]). Substantial likelihood or reasonable probability does not require the petitioner to demonstrate that the jury more likely than not would have acquitted him had it properly been instructed. See *Strickler* v. *Greene*, 527 U.S. 263, 280, 297–98, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) (Souter, J., concurring in part and dissenting in part) (agreeing with majority that " 'reasonable probability' " under *Brady*[17] does not require defendant to show that different result is more likely than not, but suggesting that, because term is misleading, " 'significant possibility' would do better at capturing the degree to which the undisclosed evidence would place the actual result in question, sufficient to warrant overturning a conviction or sentence"); *United States* v. *Hernandez*, 94 F.3d 606, 610 (10th Cir. 1996) ("[t]here appears to be little or no difference in the operation of the 'materiality' [*Brady*] and 'prejudice' [*Frady*] tests"); *People* v. *Versteeg*, 165 P.3d 760, 765 (Colo. App. 2006) ("[A] showing of actual prejudice under *Frady* generally depends on an inference that the error affected the outcome. This is the same showing of prejudice that is required for *Strickland* or *Brady* errors." [Internal quotation marks omitted.]). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* v. *Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

As even the dissenting justices purportedly concede in the present case, this standard does not require the petitioner to show that there was insufficient evidence to convict him under *Salamon* to prevail. Insufficient evidence would require the petitioner to meet an even higher standard than the inapplicable more probable than not standard. See *State* v. *Bennett*, 307 Conn. 758, 763, 59 A.3d 221 (2013) ("[i]n reviewing a sufficiency of the evidence claim, we construe the evidence in the light most favorable to sustaining the verdict, and then determine whether from the facts so construed and the inferences reasonably drawn therefrom, the trier of fact reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt"). A recent decision, however, in which this court concluded that it was a "close case" under that higher standard, illustrates why there is a substantial likelihood that a properly charged jury would not have convicted the petitioner. See *State* v. *Ward*, 306 Conn. 718, 736, 51 A.3d 970 (2012). In *Ward*, this court reviewed a trial court's judgment setting aside a verdict finding the defendant guilty of kidnapping but leaving the defendant's sexual assault conviction intact, which required the court to view the evidence in the light most favorable to supporting the jury's verdict. Id., 729–30. In reversing the trial court's judgment, this court explained: "Although this is a close case, we conclude that the jury, which had been instructed on the applica-

ble legal principles in accordance with *Salamon,* reasonably could have found that the defendant's confinement or movement of the victim was not merely incidental to the sexual assault. The victim, who weighed a mere 100 pounds, testified that she could not escape because the defendant was twice her size and held her very tightly. By moving the victim away from the kitchen door, the defendant made the possibility of escape even more remote. From this testimony, it was reasonable for the jury to conclude that the defendant could have sexually assaulted the victim without threatening to kill her and without continuously holding the knife sharpening tool to her neck and, therefore, that the force used by the defendant exceeded the amount necessary to commit the sexual assault. It was also reasonable to infer that the defendant, by engaging in this conduct, intended to frighten and subdue the victim to prevent her from struggling, trying to escape or summoning assistance. In light of the evidence, the jury also reasonably could have concluded that the defendant increased the risk of harm to the victim by holding the pointed metal knife sharpening tool to her neck and by moving her away from the kitchen door, which not only made it less likely that she would escape, but also made it less likely that the crime would be detected. . . . Moreover, given the disparity in size and strength between the defendant and the victim, it was reasonable for the jury to conclude that the defendant did not need to move the victim from the kitchen in order to sexually assault her. If he intended to move her to a location that was more comfortable for him, he could have quickly moved her to the bedroom and onto the bed. Instead, he moved her from the kitchen to the bedroom, and ultimately onto the floor. Finally, although the incident lasted ten to fifteen minutes, the sexual assault itself lasted only two minutes." (Citation omitted; footnote omitted.) Id., 736–37.

By contrast, in the present case, the petitioner's actions preceding the sexual assault appear to have taken seconds. He released K as soon as he completed the sexual assault. Although the asportation of K to a darker spot could help avoid detection, a jury reasonably could conclude that the petitioner had moved K from the parking lot to the nearby grass for his comfort. Her ability to escape was not diminished by moving her to the grass by the bush because this placed K closer to an occupied residence. The petitioner used no weapon to threaten K and thus did not increase the risk of harm to her on that basis. Except for the brief moment when the petitioner placed his hand over K's mouth, her physical ability to summon help was impaired solely due to the nature of the sexual assault. If the facts of *Ward* present a close case as to whether there was sufficient evidence to support a kidnapping conviction, then the facts in the present case would clearly undermine confidence in the petitioner's convic-

tion due to the omission of a *Salamon* instruction.

The cases cited by the dissenting justices in support of their position all involve determinations of sufficient evidence to support a kidnapping conviction, not determinations of substantial likelihood of actual prejudice. Unlike *Ward*, however, the cases cited from other jurisdictions are not particularly persuasive because, although they consider a similar legal standard to ours, they give no indication of whether the evidence was merely sufficient or well in excess of that necessary to convict. Indeed, the fact that these cases involved far longer periods of restraint, far greater distances of asportation, continued restraint after completion of the nonkidnapping offenses, or numerous, distinct acts of restraint and asportation demonstrates why the present case is sufficiently close to require a new trial. See *Yearty* v. *State*, 805 P.2d 987, 993 (Alaska App. 1991) (defendant's restraint of victim "went significantly beyond that which was merely incidental to the sexual assault" when defendant pulled victim off of bike path, "dragged him to a secluded area several hundred feet away, and there held him captive for almost an hour"); *State* v. *Gordon*, 161 Ariz. 308, 315–16, 778 P.2d 1204 (1989) (The "[d]efendant went beyond the restraint [kidnapping] inherent in the ultimate crime [of sexual assault]—he held the victim on the floor, hit her with his fists, and strangled her. Thus, the manner in which he committed the kidnapping added to the victim's suffering and increased her harm or risk of harm beyond that inherent in the ultimate crime."); *Lee* v. *State*, 326 Ark. 529, 531, 932 S.W.2d 756 (1996) (defendant followed victim, grabbed her around her neck while she was on public sidewalk, and "dragged her approximately one city block to the back of the school building where there was no light," where he raped her); *People* v. *Robertson*, 208 Cal. App. 4th 965, 973, 146 Cal. Rptr. 3d 66 (2012) (defendant ordered victim to enter dark garage, locked door with key, grabbed victim from behind, and ordered her to walk toward front of garage where large tub full of water was located; when victim refused, defendant pushed her forward toward tub and ordered her to lie down; victim did not scream or struggle when defendant sexually assaulted her near tub because she was afraid that defendant would throw her in tub and drown her); *People* v. *Johnson*, 26 N.E.3d 586, 589–90 (Ill. App.) (defendant forcibly moved victim from sidewalk to vacant lot, where he completed sexual act before moving her across alley to area between two garages where he raped her twice), appeal denied, 39 N.E.3d 1007 (Ill. 2015).

The cases from this court cited by the dissenting justices yield even less support. See *State* v. *Sanseverino*, supra, 291 Conn. 574; *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008). Those cases involved direct appeals reviewing verdicts rendered in the absence of a *Salamon* instruction. In both cases, it seemed unlikely

that the state had sufficient evidence to prevail on retrial but the court thought it appropriate to afford the state the opportunity to marshal additional evidence in support of the new standard. See *State* v. *Sanseverino*, supra, 584–85; *State* v. *DeJesus*, supra, 439 (ordering new trial because "any insufficiency in proof was caused by the subsequent change in the law under *Salamon*, rather than the government's failure to muster sufficient evidence"). In *State* v. *Salamon*, supra, 287 Conn. 549–50, the court concluded that it could not say that the defendant's restraint of the victim *necessarily* was incidental to his assault of the victim, and thus it was a factual question for a properly instructed jury.[18] The dissenting justices reliance on these cases is troubling insofar as it suggests that they view *Salamon* as inapplicable to cases in which even the slightest movement or restraint of the victim beyond that which is absolutely essential to the commission of the nonkidnapping offense is established.

The cases cited by the dissenting justices indicate that they have failed to give meaningful effect to three critical, related aspects of the holding in *Salamon*. First, by focusing solely on whether there was any restraint or asportation beyond that *necessary* for the commission of the sexual assault, the dissenting justices ignore the "incidental to" language in *Salamon*. See *State* v. *Salamon*, supra, 287 Conn. 542 ("merely incidental to and necessary for the commission of another crime against that victim"); accord id., 547. Restraint may be incidental to a sexual assault that is not necessary for its commission. Second, the dissenting justices give no meaningful effect to the requirement that the additional restraint or asportation have "independent criminal significance . . . ." Id., 547. The court in *Salamon* indicated that unlawful restraint, not kidnapping, would be the proper charge in the absence of such independent significance. See id., 548 ("because the confinement or movement of a victim that occurs simultaneously with or incidental to the commission of another crime ordinarily will constitute a substantial interference with that victim's liberty, such restraints still may be prosecuted under the unlawful restraint statutes"); see also id., 546 (indicating alignment of interpretation in *Salamon* with "majority view regarding the construction of statutes delineating the crime of kidnapping . . . the salutary effect of which is to prevent the prosecution of a defendant on a kidnapping charge in order to expose him to the heavier penalty thereby made available, [when] the period of abduction was brief, the criminal enterprise in its entirety appeared as no more than an offense of robbery or rape, and there was lacking a genuine kidnapping flavor" [citations omitted; internal quotation marks omitted]).

Finally, and related to the two preceding concerns, the dissenting justices do not recognize that the degree and nature of the restraint or asportation bears on the

ultimate question—the perpetrator's *intent* in taking these actions. See id., 532 ("the proper inquiry for a jury evaluating a kidnapping charge is not whether the confinement or movement of the victim was minimal or incidental to another offense against the victim *but, rather, whether it was accomplished with the requisite intent*, that is, to prevent the victim's liberation" [emphasis added]); id., 542 ("[o]ur legislature, in replacing a single, broadly worded kidnapping provision with a gradated scheme *that distinguishes kidnappings from unlawful restraints by the presence of an intent to prevent a victim's liberation*, intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against that victim" [emphasis added]). Indeed, it was the ambiguity in the distinction between the intent to commit a kidnapping and the intent to commit an unlawful restraint that was at the heart of the analysis in *Salamon*. See id., 534 ("Those previous decisions [by our court] . . . have not explored the parameters of that intent, in particular, how the 'intent to prevent [a victim's] liberation'; General Statutes § 53a-91 (2); that is, the intent necessary to establish an abduction, differs from the intent 'to interfere substantially with [a victim's] liberty'; General Statutes § 53a-91 (1); that is, the intent necessary to establish a restraint. Certainly, when an individual intends to interfere substantially with another person's liberty, he also intends to keep that person from escaping, at least for some period of time; in other words, he intends to prevent that person's liberation. Thus, the point at which an intended interference with liberty crosses the line to become an intended prevention of liberation is not entirely clear."). Although the perpetrator's conduct is circumstantial evidence from which the jury infers such intent; see *State* v. *Smith*, 198 Conn. 147, 154–55, 502 A.2d 874 (1985); it is the degree and nature of the restraint or asportation that informs that inference.

Although we underscore that a determination of sufficient evidence to support a kidnapping conviction is not the appropriate yardstick by which to assess the likelihood of a different result, we note a recent decision by Judge Mullins that reflects a more nuanced and appropriate comparison of cases with regard to these essential aspects of *Salamon*. See *Mitchell* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-10-4003542-S (February 27, 2014) (57 Conn. L. Rptr. 776). "Although no minimum period of restraint or degree of movement is necessary for the crime of kidnapping, an important facet of cases where the trial court has failed to give a *Salamon* instruction and that impropriety on appellate review has been deemed harmless error is that longer periods of restraint or greater degrees of movement demarcate separate offenses. See

*State* v. *Hampton*, supra, 293 Conn. 463–64 (defendant confined victim in a car and drove her around for approximately three hours before committing sexual assault and attempted murder); *State* v. *Jordan*, [129 Conn. App. 215, 222–23, 19 A.3d 241 (2011)] (evidence showed the defendant restrained the victims to a greater degree than necessary to commit the assaults even though assaultive behavior spanned entire forty-five-minute duration of victims' confinement) [cert. denied, 302 Conn. 910, 23 A.3d 1248 (2011)]; *State* v. *Strong*, [122 Conn. App. 131, 143, 999 A.2d 765] (defendant's prolonged restraint of victim while driving for more than one hour from one town to another not merely incidental to threats made prior to the restraint) [cert. denied, 298 Conn. 907, 3 A.3d 73 (2010)]; and *State* v. *Nelson*, [118 Conn. App. 831, 860–62, 986 A.2d 311] (harmless error when defendant completed assault and then for several hours drove victim to several locations) [cert. denied, 295 Conn. 911, 989 A.2d 1074 (2010)]. Thus, as these cases demonstrate, multiple offenses are more readily distinguishable—and, consequently, more likely to render the absence of a *Salamon* instruction harmless—when the offenses are separated by greater time spans, or by more movement or restriction of movement.

"Conversely, multiple offenses occurring in a much shorter or more compressed time span make the same determination more difficult and, therefore, more likely to necessitate submission to a jury for it to make its factual determinations regarding whether the restraint is merely incidental to another, separate crime. In those scenarios, where kidnapping and multiple offenses occur closer in time to one another, it becomes more difficult to distinguish the confinement or restraint associated with the kidnapping from another substantive crime. The failure to give a proper *Salamon* instruction in those scenarios is more likely to result in harmful error precisely because of the difficulty in determining whether each crime has independent criminal significance. See *State* v. *Thompson*, [118 Conn. App. 140, 162, 983 A.2d 20 (2009)] (within fifteen minutes defendant entered victim's car, pushed her behind a building and sexually assaulted her) [cert. denied, 294 Conn. 932, 986 A.2d 1057 (2010)]; *State* v. *Flores*, [301 Conn. 77, 89, 17 A.3d 1025 (2011)] (defendant's robbery of victim in her bedroom lasted between five and twenty minutes); *State* v. *Gary*, [120 Conn. App. 592, 611, 992 A.2d 1178] (defendant convicted of multiple sexual assaults and an attempted sexual assault that were 'in close temporal proximity to the defendant's restraint of the victim'; thus court determined evidence reasonably supports a finding that the restraint merely was incidental to the commission of other crimes, namely, sexual assaults and attempted sexual assault; lack of *Salamon* instruction harmful error) [cert. denied, 297 Conn. 910, 995 A.2d 637 (2010)]." *Mitchell* v. *Warden*, supra, 57

Conn. L. Rptr. 781–82.

This discussion effectively illustrates why the petitioner's claim would succeed even under the more stringent prejudice standard for procedurally defaulted claims. The close alignment in time and place of K's restraint and abduction to the sexual assault calls into serious question whether reasonable jurors would conclude that the petitioner intended to restrain K for any purpose other than the commission of the sexual assault. Accordingly, there is a substantial likelihood that reasonable jurors would conclude that the state failed to meet its burden of proving beyond a reasonable doubt that the conduct had sufficient independent significance to warrant a conviction of kidnapping in the first degree. Accordingly, the Appellate Court properly concluded that the habeas court's judgment should be affirmed insofar as it granted the petitioner a new trial on his kidnapping conviction.

## II

We turn next to the petitioner's appeal, which challenges the Appellate Court's determination that a claim of cumulative trial error as a violation of due process is not cognizable under Connecticut law. See *Hinds* v. *Commissioner of Correction*, supra, 151 Conn. App. 860, citing *State* v. *Samuels*, 273 Conn. 541, 562, 871 A.2d 1005 (2005), and *State* v. *Reddick*, 33 Conn. App. 311, 338–39, 635 A.2d 848 (1993), cert. denied, 228 Conn. 924, 638 A.2d 38 (1994). The petitioner contends that the United States Supreme Court and every federal Circuit Court of Appeals recognize that trial errors individually insufficiently harmful to warrant a new trial may by their cumulative effect deprive a defendant of a fair trial in violation of his right to due process. He further contends that Connecticut case law does not bar such a claim, and would violate the supremacy clause of the federal constitution if it did.

The respondent contends that this claim was procedurally defaulted due to the petitioner's failure to raise it in his direct appeal, and that the petitioner failed to establish cause and prejudice to overcome the default. The respondent alternatively contends that the failure to recognize claims of cumulative error does not violate due process under federal law, and even if such claims were cognizable, the petitioner would not be entitled to relief on this basis. We conclude that, even if we were to recognize the cumulative error doctrine as articulated in the federal courts and to deem it applicable to habeas proceedings, the trial improprieties in the present case would not justify relief under that doctrine.

Federal case law in which the " 'cumulative unfairness' " doctrine; *United States* v. *Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008); has required reversal of a conviction essentially seems to fall into one or more of the following categories: (1) the errors directly

related to and impacted an identified right essential to a fair trial, i.e., the right to a presumption of innocence or the right to present witnesses in one's own defense; (2) at least one of the errors was so significant as to render it highly doubtful that the defendant had received a fair trial and the remaining errors created the additional doubt necessary to establish that there was serious doubt about the fairness of the trial, which is necessary to reverse a conviction; or (3) the errors were pervasive throughout the trial.[19] The trial improprieties identified in the petitioner's direct appeal do not fall within any of these categories.

The Appellate Court identified three improprieties. First, it determined that the trial court improperly admitted into evidence a photograph showing the petitioner with his underwear pulled down around his knees, with black tape covering the part of the photograph showing his genitals, taken when the petitioner was incarcerated. *State* v. *Hinds*, supra, 86 Conn. App. 572–74. The state had used this photograph to rebut the petitioner's misidentification theory premised in part on testimony that he never wore underwear. Id., 572. The Appellate Court determined that the photograph was not probative because it had been taken two years after the assault, but that its admission was harmless because it was cumulative of testimony, admitted without objection, that the petitioner had been wearing underwear when the photograph was taken. Id., 573–74. Second, the Appellate Court determined that there was an insufficient evidentiary basis to support the consciousness of guilt jury instruction regarding certain purportedly false statements made by the petitioner during the police investigation as to where he was staying and how long he had been in town. Id., 563–68. The court concluded that the statements were neither made in an effort to exculpate the petitioner nor connected to the crimes, but that the instruction was harmless given the strength of the state's case, in particular, the close match of the victim's description of her attacker and his vehicle to the petitioner and his truck. Id., 568–69. Third, the Appellate Court determined that the trial court improperly had failed to give the jury a supplemental answer correcting its earlier inaccurate answer to the jury's question as to whether a witness had testified regarding the date and time on a security recording of the Super Stop & Shop parking lot showing a vehicle similar to the one identified by the victim. Id., 569–71. The court deemed this error harmless because the correct information would have tended to inculpate the petitioner. Id., 571.

The petitioner claims that "the combined effect of [these improprieties] rendered [his] defense of misidentification far less persuasive, in violation of the constitutional right to a fair trial." We are not persuaded that improprieties of this magnitude present a colorable basis for application of the cumulative error rule applied

by the federal courts. Therefore, we need not consider whether our case law is in conflict with federal law.

The judgment of the Appellate Court is affirmed.

In this opinion ROGERS, C. J., and PALMER and DiPENTIMA, Js., concurred.

\* This appeal originally was argued before a panel of this court consisting of Chief Justice Rogers, and Justices Palmer, Zarella, Eveleigh, McDonald and Robinson. Thereafter, Chief Judge DiPentima was added to the panel and she has read the briefs and listened to a recording of the oral argument prior to participating in this decision.

[1] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person . . . or by the threat of use of force against such other person . . . which reasonably causes such person to fear physical injury to such person . . . ."

General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

[2] We have omitted facts relevant to events that occurred after the petitioner's interactions with the victim, which provided additional support for the petitioner's convictions, as they are not relevant to our resolution of the issues in this habeas action. See *State* v. *Hinds*, 86 Conn. App. 557, 559–63, 861 A.2d 1219 (2004), cert. denied, 273 Conn. 915, 871 A.2d 372 (2005).

[3] In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the victim. See General Statutes § 54-86e.

[4] Justice Zarella's contention that "the parties have not raised the issue of whether the rule should be replaced in their separate appeals to this court" is beside the point. The petitioner does not make such a sweeping argument, but instead argues that procedural default does not apply *in this case* because, under *Luurtsema II*, there is no default of a *Salamon* claim. If there is no default, there is no basis to engage in the cause and prejudice analysis to determine whether procedural default is excused.

[5] " 'Abduct' means to restrain a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation." General Statutes § 53a-91 (2).

" 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. . . ." General Statutes § 53a-91 (1).

[6] Because we conclude that the petitioner's *Salamon* claim is not subject to procedural default, we need not consider the petitioner's alternative argument that the Appellate Court properly determined that he established good cause to excuse any default under *Reed* v. *Ross*, 468 U.S. 1, 104 S. Ct. 2901, 82 L. Ed. 2d 1 (1984), in light of this court's repeated rejection of a *Salamon* type claim. In *Reed*, the United States Supreme Court identified three situations in which a new constitutional rule might emerge from that court, which, if applied retroactively, would result in a circumstance in which counsel would have had no reasonable basis in existing law to seek habeas relief. Id., 17. One such situation was that court's overruling of its precedent. Id. The court reasoned that, in that situation, "the failure of a defendant's attorney to have pressed such a claim before a state court is sufficiently excusable to satisfy the cause requirement." Id. Subsequent case law has raised questions about the scope of this good cause exception. See, e.g., *Bousley* v. *United States*, 523 U.S. 614, 622–23, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998) (distinguishing novel claims from futile claims); *Engle* v. *Isaac*, 456 U.S. 107, 130–34, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982) (same); but see *Peck* v. *United States*, 106 F.3d 450, 456 (2d Cir. 1997) (concluding that petitioner "demonstrated 'cause' for his failure to pursue on direct appeal his contention of instructional error because this court had definitively resolved the question as to the proper jury instruction regarding scienter and the Supreme Court had not agreed to review the issue prior to the deadline for [the petitioner] to file an appeal"). Neither *Bousley* nor *Engle*, however, involved claims that would have required the United States Supreme Court or the state's highest court to overrule those courts' prece-

dents. Justice Zarella's dissenting opinion does not, in our view, fairly address the question of whether three decades of precedent from the highest reviewing court renders a legal argument challenging that precedent not merely futile, but one for which the petitioner would have no reasonable basis in existing law, even if the claim cannot be deemed "novel" because it previously has been raised in some form. In light of our resolution of this appeal on different grounds, we leave those questions for another day.

[7] The respondent and Justice Zarella argue that *Luurtsema II* has no precedential value because the main opinion, to which we refer, was a plurality decision, and there were three separate concurring opinions. Justice Katz' concurring opinion rested on due process, rather than common-law grounds, but she expressly addressed the ground on which the plurality rested its decision and stated: "I wholly agree with the plurality's thoughtful explanation as to why we should reject the state's call to adopt a per se rule against retroactivity and its equally persuasive rejection of the state's arguments against affording relief to the petitioner in the present case." *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 791. Her sole disagreement with the majority's resolution of that issue was its recognition of the possibility of unusual circumstances in which retroactivity would not apply. Id. Thus, a majority of the court rejected the state's policy arguments relating to finality.

[8] We are mindful that federal courts have concluded that procedural default will bar application of a retroactive holding. See, e.g., *Ilori* v. *United States*, 198 Fed. Appx. 543, 545 (7th Cir. 2006); *United States* v. *McCrimmon*, 443 F.3d 454, 462 n.44 (5th Cir. 2006); *United States* v. *Pettigrew*, 346 F.3d 1139, 1143–45 (D.C. Cir. 2003); see also *Bousley* v. *United States*, 523 U.S. 614, 620, 622, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998) (deeming court's limiting interpretation of criminal statute not barred by retroactivity principles but barred by procedural default). As we previously have explained, federal habeas review is constrained by statutory, constitutional, and prudential considerations other than finality of judgments. We also note that the court's retroactivity analysis in *Luurtsema II* was not premised on federal retroactivity or constitutional jurisprudence. Instead, it relied exclusively on state common law.

[9] Luurtsema's challenge to his jury instruction on direct appeal was acknowledged in the context of providing background to the case and the law leading up to *Salamon*, its sole significance being that Luurtsema's criminal case was the most recent occasion on which the court had reiterated its long-standing interpretation of kidnapping. See *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 745–46. This challenge was never mentioned in the retroactivity analysis. See id., 751–73. This omission was not an oversight. The court later mentioned this fact in a different part of the opinion when summarily rejecting Luurtsema's argument that he should not have to face retrial because he had challenged his jury instruction at trial. Id., 774.

[10] It does not appear from our review that any of these petitions were advanced by petitioners who had challenged their kidnapping instructions in their criminal proceedings. See *Luurtsema* v. *Commissioner of Correction*, Conn. Supreme Court Records & Briefs, September Term, 2010, State's Brief pp. 3–4 n.2.

[11] *State* v. *Sanseverino*, supra, 291 Conn. 579, 595, which superseded in part *State* v. *Sanseverino*, 287 Conn. 608, 949 A.2d 1156 (2008), was a companion case to *Salamon* in which this court applied the holding in *Salamon* without reaching the constitutional vagueness challenge raised by the defendant.

[12] See *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[13] In his dissent, Justice Eveleigh concludes that "the kidnapping had already occurred when [K] was restrained and knocked down in the parking lot." It is difficult to imagine how a sexual assault can be perpetrated without grabbing the victim, and the feasibility of accomplishing a sexual assault while the victim and the perpetrator are standing in the middle of a parking lot seems rather remote.

[14] Although the evidence did not establish a precise distance or time, because such facts would not have been significant in the absence of a *Salamon* instruction, the most reasonable inference from the numerous photographic exhibits and K's testimony is that the distance and time of the asportation were minimal. Put differently, it would be unreasonable to infer from the evidence that the asportation took minutes rather than seconds.

[15] By concluding that the asportation did not create a significant danger or increase K's risk of harm independent of that posed by the sexual assault, we do not intend to diminish the fact that K's fear of suffering harm was likely made greater by having been moved from a lit spot to one where it was dark.

[16] Justice Scalia's concurrence in *California* v. *Roy*, 519 U.S. 2, 6, 117 S. Ct. 337, 136 L. Ed. 2d 266 (1996), joined by Justice Ginsburg, appears to have sown some of the seeds of confusion. See id., 6, 7 (Scalia, J., concurring) (The concurring justices agreed that the standard in *Brecht* applied in a habeas case but concluded with respect to instructional error: "A jury verdict that [a criminal defendant] is guilty of the crime means, of course, a verdict that he is guilty of each necessary element of the crime. . . . Formally, at least, such a verdict did not exist here: The jury was never asked to determine that [the defendant] had the 'intent or purpose of committing, encouraging, or facilitating' his confederate's crime. . . . The absence of a formal verdict on this point cannot be rendered harmless by the fact that, given the evidence, no reasonable jury would have found otherwise. To allow the error to be cured in that fashion would be to dispense with trial by jury. . . . *The error in the present case can be harmless only if the jury verdict on other points effectively embraces this one or if it is impossible, upon the evidence, to have found what the verdict did find without finding this point as well.*" [Citations omitted; emphasis altered.]). Some courts have relied on this concurrence as providing a functional equivalent test for an omitted element in a jury instruction. See, e.g., *United States* v. *McDonald*, 150 F.3d 1301, 1304 (10th Cir. 1998); *Smith* v. *Horn*, 120 F.3d 400, 418 (3d Cir. 1997).

[17] See *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) (state's suppression of material, exculpatory evidence).

[18] The court noted: "The victim testified that the defendant, after accosting her, forcibly held her down for five minutes or more. Although the defendant punched the victim once and shoved his fingers into her mouth, that conduct was very brief in contrast to the extended duration of the defendant's restraint of the victim. In light of the evidence, moreover, a juror reasonably *could* find that the defendant pulled the victim to the ground primarily for the purpose of restraining her, and that he struck her and put his fingers in her mouth in an effort to subdue her and to prevent her from screaming for help so that she could not escape. In such circumstances, we cannot say that the defendant's restraint of the victim *necessarily* was incidental to his assault of the victim. Whether the defendant's conduct constituted a kidnapping, therefore, is a factual question for determination by a properly instructed jury." (Emphasis added; footnote omitted.) *State* v. *Salamon*, supra, 287 Conn. 549–50.

[19] See, e.g., *Chambers* v. *Mississippi*, 410 U.S. 284, 297–303, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) (application of state rules violated right of accused to present witnesses in his own defense, in combination with right to present defense); *Taylor* v. *Kentucky*, 436 U.S. 478, 486–90, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978) (instructional errors impaired right to presumption of innocence); *United States* v. *Haynes*, 729 F.3d 178, 197 (2d Cir. 2013) (defendant was improperly tried in shackles, trial court did not fulfill its obligation to investigate allegation of juror misconduct, court gave improper jury charge regarding obligations of deadlocked jury regarding further deliberations, and lay and expert testimony was erroneously admitted, all occurring in context of relatively short trial during which jury deliberated for approximately eight hours before returning deadlock note, "when considered together . . . call into serious doubt whether the defendant received the due process guarantee of fundamental fairness"); *United States* v. *Al-Moayad*, supra, 545 F.3d 178 (The improper admission of certain documentary evidence and the testimony of two witnesses " 'cast such a serious doubt on the fairness of the trial' as to warrant reversal of the defendants' convictions. That doubt is especially grave when we also take into account the district court's erroneous admission of the mujahidin form, the wedding video, and the Croatian last will and testament, as well as its questionable handling of the derivative entrapment issue."); *Gaines* v. *Kelly*, 202 F.3d 598, 605–606 (2d Cir. 2000) (cumulative effect of instructional errors impaired right to have state prove elements of offense beyond reasonable doubt); *United States* v. *Fields*, 466 F.2d 119, 120–21 (2d Cir. 1972) (cumulative effect of instructional errors impaired right to have state prove each element of offense beyond reasonable doubt); *United States* v. *Guglielmini*, 384 F.2d 602, 605–607 (2d Cir. 1967) (total effect of errors, including trial judge's conduct suggesting bias in favor of prosecution created "firm impres-

sion that the defendants did not receive the fair trial to which our law entitles them," bolstered by prosecutorial improprieties in cross-examination and argument, as well as improper reasonable doubt charge cast serious doubt on fairness of trial).

We note that, to the extent that some of these cases involve multiple defects in a jury charge relating to the same concern; see, e.g., *Taylor* v. *Kentucky*, supra, 436 U.S. 486–90; *Gaines* v. *Kelly*, supra, 202 F.3d 605–606; we question whether they should be characterized as involving cumulative error rather than simply an improper jury charge on a matter.